## STEVENSON v. THE STEAMSHIP BOVERIC.

(Second Division. Nome. December 19, 1907.)

1. SHIPPING (§ 84*)—INJURIES TO STEVEDORE—FELLOW SERVANTS.

Libelant was employed by a lighterage company to work in unloading coal from the vessel to a barge lying alongside. He worked in the hold of the vessel at the bottom of the hoistway. The coal was being raised from the hold through the hatchway in a sling, and thence lowered over the side upon the barge. The coal was raised out of the hold by a steam winch belonging to the vessel and operated by a member of the vessel's crew. The hoist rope ran from the drum of the winch, through a block on the end of an overswinging yard, and thence to the hold. On the end of the line were fastened scales for weighing the coal, and fastened below the scales was the sling for carrying the coal. On hoisting the scales and sling from the barge to return them to the hold, the winchman carelessly permitted the machinery to carry them aloft with force, whereby the scales were broken from their fastening, and fell down the hatchway upon, and injured, libelant. *Held*, the winchman was not a fellow

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

servant with libelant, and that the vessel was liable for damages for the injury.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 84.*]

This suit is for personal injuries received by the libelant, a stevedore, when engaged in discharging cargo on board the British steamer Boveric. At the time of the injuries the ship was under charter from its owners, Andrew Wier & Co., the respondents, to the Northwestern Steamship Company. The cargo, consisting of coal in sacks and in bulk, was received at Nanaimo, British Columbia, and the ship in the course of her voyage therefrom had reached the roadstead off the mouth of Solomon river, Alaska, about 35 miles from the town of Nome, Alaska. There on July 17, 1907, the libelant was employed as a stevedore to assist in discharging the cargo from the hold of the ship to lighters alongside, and was engaged in the after hatchway of the ship in loading coal upon slings which upon being loaded were hoisted through the hatchway clear of the ship's upper deck and lowered into the lighter or barge. Weighing scales had been connected by means of a buckle to the freight hook attached to the hatch fall, and the sling was suspended upon a hook in the lower part of the scales as the scales hung from the fall. The scales were used by the deputy collector of the United States customs in weighing the coal from time to time as it was being hoisted, for the purpose of determining the duty upon the coal.

The contract for the discharge of the cargo from the ship and lightering it to shore had been given by the Northwestern Steamship Company to the North Coast Lighterage Company, a corporation engaged in the business of lightering from ships at Nome and other ports on the coast of Behring's Sea, and the libelant was in its employ. Besides him were five other stevedores in its employ, who worked with him in the hold in loading coal upon the slings; two of the six by turns loading

---

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

one sling. Another stevedore in the same employ was stationed as hatch tender on the deck at the top of the afterhatch. It was his duty to expedite the work of discharging the cargo by passing signals received from the workman in the hatch to the winchman who operated the steam winches, thus informing them when to hoist, and also to watch the movements of the sling and to signal when to lower, when to stop hoisting or lowering, when to speed, and when to go slowly.

From his position at the hatch, the workmen in the hatch, the winchmen, and bargemen as the work of discharging cargo went on were in his view; whereas, the winchman could not see the men, scales, and slings when they were in the hatch below or between decks. By the terms of the charter party the owners agreed to furnish the steam winches used in discharging the cargo and to provide men to operate them. The stipulation of the charter party touching the winches and winchmen is comprised in paragraph 24 thereof, and reads as follows:

"Steamer to work night and day, if required by charterers, and all steam winches to be at charterers' disposal during loading and discharging; the steamer to provide men to work same both day and night, if required."

The libelant was injured about 1 o'clock in the afternoon. The duty of the winchmen in the process of unloading was at the appropriate signal by the hatch tender to raise the loaded slings from the hatch, so as to clear the ship's deck, and from their elevation above the deck to lower them to the barge alongside the ship, and to start and stop the winches. Each winchman operated the fall attached to a boom—one, the amidship boom's fall; the other, hardarm boom's fall. Attached to the end of the amidship boom of the ship, by means of a hook on the hatchway fall and a buckle or ring on the scales, were the scales of the customs department, and suspended upon a hook inserted in the lower end of the scales was the

net sling, in which the coal was elevated from the ship's hold. Immediately before the libelant received his injuries a sling load of coal had been lifted from the hold and delivered upon the barge or scow, and the scales and empty sling had been returned to a suspended position above the ship's deck, at which juncture the winchman received a signal from the hatch tender to lower the scales to the deck, so that he could detach the scales from the freight hook at the end of the amidship boom; but the winchman operating that boom paid no heed to the signal, and continued to raise the scales and sling until they struck the end of the boom, bending it upward and driving the freight hook into the gin block, and thus released the scales from the freight fall, dropping them into the hatch and downward upon the libelant. The scales in their fall knocked the libelant insensible, besides cutting three gashes upon his head, causing a severe contusion of his shoulder and arm, a fracture of his right arm, and a dislocation of his right elbow. His injuries disabled him for work as a stevedore for the season of open navigation of the year 1907 on Behring's Sea, lasting till about October 20, 1907, and also partially unfitted him for clerical work, of which he had theretofore been capable.

John Rustgard and O. D. Cochran, for libelant.

Dudley Dubose, H. Y. Freeman, T. M. Clowes, and Thomas R. Shepherd, for respondent.

MOORE, District Judge. That the winchman in charge of the amidship boom was guilty of want of ordinary care in hoisting the scales and sling till they came in collision with the boom above and the gin block was clearly proven by the evidence. He seems to have disregarded the signal of the hatchway tender to lower the scales, if he observed the signal, and he does not in his testimony deny that the hatchwayman made the signal, or that he noticed it. The winchman had the independent duty cast upon him, by virtue of his position and

relations to the ship and work to be observant, and to so reg-
ulate and direct the motion of the scales and sling as to avoid
injury to workmen and property.   But, even if the signal was
not heard or seen by the winchman, his raising the scales so
as to cause them to strike the boom above was under the cir-
cumstances unnecessary, and showed culpable negligence on
his part.

The winchman testified that, on seeing the ascending scales
were about to be dropped from their hook, without shutting
off all the steam, he went to shout a warning to the stevedores
at work in and about the hatch.   His plain first duty was to
arrest the upward movement of the scales by stopping his
winch at once.   This upon his own admission he did not do.
The libelant, in imputing the negligence of the winchman to
the ship and its owners, proceeds upon the theory that the
winchman was the servant of the ship.

The respondent's contention, on the other hand, is that the
winchmen were given over to the sole control of the charterers
and their agents, and that the winchmen were fellow servants
of the injured libelant under the contracting stevedores, and
hence having assumed, by virtue of his employment, the risk
of injuries by his fellow servants, the ship cannot be held re-
sponsible for the negligent acts of one of the winchmen.   The
winchmen were assigned by the master of the ship from the
ship's crew to operate the winches in discharging the cargo,
and during the process they remained members of the crew
and continued to receive their wages from the ship.   The
owners of the ship, it seems, preferred to operate their winches
with men of their own choosing, whom they were at liberty to
discharge and to displace with others, if their work should not
prove satisfactory to them, or to the charterers or their agent,
the lighterage company.   They were put at the disposal of the
charterer, because the charter party bound them so to do.

In co-operating with the stevedores aboard the ship in the

work of discharging the ship, they were, from necessity, compelled to obey the signals of some person at the hatchway, because they could not see the sling while it was below the combing of the hatchway, and could not see the stevedores at work in loading the sling. The owners, without violating any part of their contract with the charterers, could have placed in the stevedore's place at the hatchway, or with him, one of the crew whose signals the winchmen would have been bound to obey. They did not provide a hatchway tender, and the winchmen obeyed him simply because he was there to give signals, and not because the charter party absolutely required obedience from them.

It is to be noted that during the time when the scales and sling were moving in that part of their circuit above the hatchway and the upper steamer deck and its side rail the winchmen were well able to regulate the movements of their winches without any assistance from the hatchway tender. For that period of time the winchmen were, it may be justly said, masters of all the movements of the sling and scales, except at such times as the customs officer might desire to have the scales released from their attachment to the freight hook and sling. It was while the scales were moving along the upper arc of their circuit that they fell upon the libelant.

It is a fact, too, of considerable importance in the decision of the case, that the injuries were received at the moment when the scales and sling were being forced by the amidship winchman upward in disregard of the signals and shouts of the hatchway tender, and when the hatch fall was in the sight of the winchman. At that particular time the winchman was charged with the duty of exercising his own mind and will, so as to avoid doing harm to the workmen; for he then assumed to direct the speed and movements of the machine without the aid of the hatchwayman. In the light of all these facts, brought out and established by the evidence, the conclusion is

inevitable that the libelant's injuries were directly caused, first, by the lack of care evinced by the amidship winchman in hoisting the fall controlled by him till it struck the gin block, and afterwards by his neglect to shut off all the steam, when he left the winch with some steam on to sound the alarm of danger. It follows that the hatchway tender must be acquitted of all agency in causing the scales to fall upon the libelant. Unless the winchman is to be treated as the fellow servant of the libelant, the ship must be held responsible to the libelant for his injuries, losses, and sufferings and impairment of bodily power.

In support of the proposition that the respondents must suffer in this case for the negligence of the winchman, the following authorities are closely in point: Johnson v. Navigation Co., 132 N. Y. 576, 30 N. E. 505; Sanford v. Standard Oil Co., 118 N. Y. 571, 24 N. E. 313, 16 Am. St. Rep. 787; Svenson v. Steamship Co., 57 N. Y. 108.

In the case of Johnson v. Navigation Co., supra, decided by the New York Court of Appeals, the facts were these: The plaintiff, a stevedore acting as hatchwayman in the employ of A., gave orders, while unloading a steamer owned by B., to a winchman in the employ of B., when the rope ran off the drum of the winch onto the axle, directing him to turn the winch back. Instead of reversing the winch, the winchman started ahead, drawing the hatchwayman's hand against the drum and cutting off some of his fingers. Held as follows:

"It is quite apparent that it was the intention of B., the vessel, to retain charge of the steam power and winch, and to operate it through its own servants and employés. And the fact that the winchman received orders from the plaintiff when to hoist and when to lower, under the circumstances of this case, does not operate to change his relations to the defendant as its servant."

In that case, as in the case at bar, A. took a contract from B., whereby B. was to furnish the steam power and a winch

driver to aid A. in unloading the ship, and the court further said:

"It does not appear that he [the contracting stevedore] had power to order, direct, discharge, or control the winch driver further than to signal to him, by way of the gangwayman, when to hoist or lower, go ahead, or come back. It consequently does not appear to us that the winchman could be regarded as the servant of A."

The court in that case relies upon these New York authorities: Sullivan v. Railroad Co., 112 N. Y. 643, 647, 20 N. E. 569, 8 Am. St. Rep. 793; Sanford v. Oil Co., 118 N. Y. 571, 24 N. E. 313, 16 Am. St. Rep. 787; Kilroy v. Canal Co., 121 N. Y. 22, 24 N. E. 192; Butler v. Townsend, 126 N. Y. 105, 26 N. E. 1017.

In Sanford v. Oil Co., supra, the facts were: Plaintiff was employed by a firm of stevedores, who had a contract to load a vessel from the dock of the defendant. Defendant furnished the hoisting apparatus, with a man to manage the same. Owing to the negligence of this employé in raising a barrel from the dock without warning, plaintiff was injured. Held, the man furnished by the dock owners was not a fellow servant with the plaintiff.

The court in Sanford v. Oil Co. adopts as controlling authority the decision in Sullivan v. R. R. Co., supra. In the latter case Sullivan, a servant of the New York, Lake Erie & Western Railroad Company, was injured by an engine of the Tioga Railroad Company, in the other railroad company's yard at Elmira, N. Y.; the Tioga Company having the right as licensee to run its engine through the New York, Lake Erie & Western Railroad Company's yard. The plaintiff's intestate was working in the New York, Lake Erie & Western Railroad Company's ash pit within the yard as an employé of said company, and was struck by an engine of the Tioga Company, and received a compound fracture of the foreleg. Held, that intestate and defendant's engineer and fireman were not

fellow servants of the man in the ash pit, so as to relieve defendant from liability for their negligence.  Neither servant was responsible to the master of the other for the manner in which he performed his work.  There was no common master. Each servant, therefore, is entitled to protection against the negligence of the other—citing Smith v. Railway Co., 19 N. Y. 128, 75 Am. Dec. 305; Svenson v. Steamship Co., 57 N. Y. 108, supra.  The justices of the highest court of New York, in deciding this case, do not deny that the servant of one master may become the temporary servant of another, as, for example, by loan or hire to the other.  They simply announce the principle that a servant, who by the prior arrangement of his employer uses a machine, the property of the employer, in the service of another, does not thereby become the servant of the other, unless the man and the machine are made wholly subject for the time by the employer to the exclusive will, control, and direction of the other.

This array of state authorities is further supported by a line of federal cases which furnish authority for the doctrine just announced.  It will be seen that these federal cases specially apply to a state of facts where winchmen on a vessel are assigned by their employer to the temporary service of another; the employer being the owner of the vessel and still retaining his right of discharging the winchmen for fault or substituting others for them at his will.  Of these cases the following are the most authoritative as precedents for this court to follow: Davi v. Victoria (D. C.) 69 Fed. 160 (1895); McGough v. Ropner (D. C.) 87 Fed. 534 (1898); The Lisnacrieve (D. C.) 87 Fed. 570 (1898); The Slingsby, 120 Fed. 748, 57 C. C. A. 52 (1903); The Gladestry, 128 Fed. 591, 63 C. C. A. 198 (1904); Standard Oil Co. v. Anderson, 152 Fed. 166, 81 C. C. A. 399 (1907); Otis Steel Co. v. Wingle, 152 Fed. 914, 82 C. C. A. 62 (1907).

3 A.R.—30

In the case of The Victoria the libelant brought suit for personal injuries received when he was engaged as a stevedore in discharging the ship's cargo. The ship furnished the power, machinery, and winchmen to hoist the cargo out of the hold. Winchman disregarded orders to, "go easy." By starting winch rapidly the sling of boxes struck libelant. Held, that the winchman was negligent, and the doctrine of fellow servant does not apply in such a case. Here Benedict, District Judge, relied on Johnson v. Navigation Co., 132 N. Y. 576, 30 N. E. 505, supra, as controlling under the facts.

McGough v. Ropner (D. C.) 87 Fed. 534, supra, was a case in the Eastern District of Pennsylvania before Butler, District Judge. The facts were similar to those in the preceding case. The libelant, a stevedore, was in the employ of a contracting stevedore, and was assisting in loading the steamship Saxby in the port of Philadelphia. Contract bound the contracting stevedore to load the vessel; she furnishing the winch and a member of her crew to work it, together with the necessary steam power, gear, and tackle. A sling load was drawn up the skids to and across the hatch, spilling the load on the libelant, who was working in the hold immediately below. Accident held due to winchman's carelessness or incompetency. Hatch tender ordered him to "go easy" and "stop on the skid." Held, the fault leading to the accident was the fault of the ship in operating its winch and tackle. The fact that she was under charter was not deemed material under the circumstances. The court said:

"The owner retained control, furnishing the officers and crew, and consequently remained liable to all the ordinary responsibilities of such owners."

He based this ruling on the authority of Leary v. U. S., 14 Wall. 607, 20 L. Ed. 756; U. S. v. Shea, 152 U. S. 178, 14 Sup. Ct. 519, 38 L. Ed. 403; Sherlock v. Alling, 93 U. S. 99,

23 L. Ed. 819; The Terrier (D. C.) 73 Fed. 265.   The judge
further said:

"The stevedore contracted to load, subject to the agreement that
the ship would aid in the work, and charged accordingly.   The
winchman was therefore not in the employment of the stevedore, but
of the ship of whose crew he was a member, and was not, therefore,
a fellow workman with the libelant in the sense in which the law
uses this term.   The case is not distinguishable, I think, from The
Victoria (D. C.) 69 Fed. 160, and Johnson v. Navigation Co., 132 N.
Y. 576, 30 N. E. 505."

The case at bar stands upon all fours, in respect to its facts
and principles, with the two foregoing cases.

The Slingsby, 120 Fed. 748, 751, 753, 57 C. C. A. 52, 55,
was decided by the Circuit Court of Appeals of the Second
Circuit in 1903.   The libelant was employed by a firm of steve-
dores who were engaged by a contract with the ship to dis-
charge and load the ship.   The ship was to furnish the winches
and winch drivers; the rope runners and slings to be furnished
by stevedores.   The District Judge, Thomas, who tried the
case below, held that the winchman was the servant of the
ship, and that for the winchman's negligence the libelant, who
was a servant of the stevedores, was entitled to recover against
the ship.   The appellate court affirmed his decision, and said:

"The stevedores had nothing to say about the winchman's assign-
ment to look at the winch, nor about his selection generally.   He
took his orders from the stevedores' representatives.   Whether he
should hoist, or hold, or lower, should work fast or slow, should
suspend work or resume it, were all regulated by their orders.   To
that extent he was subject to their control; but they had no author-
ity to change the character of his work, or to direct him to do any-
thing else, except to run that particular winch.   * * *   They could
not remove him, nor, if he had left the winch, could they send any
of their own men to run the ship's machine on the ship's deck.   Of
all the tests to determine whose servant was the winchman, which
have been suggested, and the authorities are far from uniform, it
would seem that this, the power of substitution of one man for an-
other, is the most satisfactory.   * * *   It may not in all cases be

as apparent as it is in this one that B. has no power to remove or differently employ the individual whom A. has selected and assigned to a special line of work; but, when it does, the amount of control which B. exercises over the individual is surely insufficient to establish, even pro hac vice, the relation of master and servant."

In the case of The Gladestry (1904, Circuit Court of Appeals, Second Circuit) 128 Fed. 591, 63 C. C. A. 198, the facts in brief were that a firm of stevedores had the contract to load and discharge the ship, by which they were to furnish all the labor and appliances, except the winchmen and winches, which were to be furnished by the ship. Libelant, a servant of the stevedores, was injured by the negligence of the winchman in failing to obey orders from the stevedores to reverse the winch. Held, that the winchman, not being under the full control of the stevedores, was not libelant's fellow servant, and that the case cannot be distinguished from that of The Slingsby, supra.

The City of San Antonio (1906) 143 Fed. 955, 75 C. C. A. 27, was a case decided by the Court of Appeals of the Fourth Circuit. The libelant was one of a number of stevedores engaged in the hold of the barge City of San Antonio at Norfolk, Va., in discharging stone from the barge. A winchman to operate the hoisting winch was furnished by the barge owners. Held, following the ruling of the court in the cases of The Slingsby and The Lisnacrieve, supra, that the barge owners were responsible for the winchman's defaults.

There are other decisions which conflict with the authorities I have reviewed; but I deem that the doctrine of the cases cited is grounded upon the better and sounder reasons, and therefore that they are entitled to be followed by this court. To review and distinguish them would extend this opinion to a needless length. It will be enough at this point to say that upon principle and authority the libelant and the winchmen were not servants of a common master, and hence could not be fellow servants, and the libelant is entitled to recover in this case.

Coming to consider the amount of damages to be awarded the libelant, the evidence shows that the libelant incurred a doctor bill of $200 and a hospital bill of $27, making a total of $227. The libelant, as the evidence further shows, was not totally deprived of earning power, except for several weeks, but in the service of John J. Sesnon Company and the Alaska Mercantile Company has earned since the accident the sum of $107. Without doubt the libelant has suffered great pain and inconvenience from his wounds, as well as mental torture. All are proper elements in the computation of his damages. The libelant is not yet able, I am convinced, to work at his former temporary employment of longshoreing; nor will he ever, as the medical testimony shows, be quite as fit for hard manual labor as he was before the accident. I do think that he will be able to follow his former trade as bricklayer when he again returns to a community where he will find that kind of work to do. As to clerical labor, he has been able to do certain light forms of clerical work during the past season. The fact remains, however, that his injuries cost him all that he could have earned during the season after July 17, 1907, as a longshoreman, and he was able to procure other work which brought him only $107. As his case appears now, he has been largely deprived of his earning power till the next season of open navigation again arrives in June, 1908. He will probably also carry with him the effects of a dislocation of his elbow joint and a fracture of the forearm the remainder of his life. In view of his sufferings, physical and mental, his almost total disability for a year to pursue his usual occupation, the indebtedness imposed on him, and his probable permanent impairment of power to do work of the class which he did before the accident, I am of the opinion that the libelant is entitled to receive from the ship and its owners, as compensatory damages for his injuries, the sum of $1,500.

Let findings in conformity to this opinion be prepared by counsel and submitted, with a decree, for the court's approval.