SHADOAN v. CINCINNATI, N. O. & T. P. RY. CO.

(Circuit Court of Appeals, Sixth Circuit. February 2, 1915.)

No. 2518.

1. TRIAL ⊚⇒178—MOTION FOR DIRECTED VERDICT—VIEW OF EVIDENCE.

On a motion to direct a verdict for the defendant, it must be assumed that plaintiff's testimony is true, and he must have the benefit of every fair inference therefrom; and the rule of fair and reasonable inference deducible from the entire evidence so challenged is not varied, even where there are contradictions in the testimony of one or more of the witnesses, since the credibility of the witnesses is purely a question for the jury.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 401–403; Dec. Dig. ⊚⇒178.]

2. MASTER AND SERVANT ⊚⇒332—ACTION FOR DEATH OF TRESPASSER—QUESTIONS FOR JURY.

A number of boys, who had stolen a ride on a freight train on defendant's railroad, were discovered and driven off at a station where the train stood on a side track. As the train was slowly moving out along the side track, and while the boys were standing ahead and to one side of it, one of them was shot and killed by a brakeman on the caboose. In an action to recover for his death, it was shown that a rule of defendant required freight brakemen to prevent unauthorized persons from riding on the trains, and the brakeman testified that he knew such rule and believed he was performing his duty thereunder when he fired the shot, intending to scare the boys and prevent them from again getting on the train. *Held*, that defendant was responsible for his act, if it was done in the course of his employment, whether it was within or without his actual authority, and whether or not the boys were in fact threatening to board the train, and that under the evidence that question was one for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1274–1277; Dec. Dig. ⊚⇒332.]

3. Courts ⬳352—Procedure—Motion for Directed Verdict—Power of Court.

It is a rule of decision in the federal courts that in disposing of a motion to direct a verdict the trial judge cannot weigh the evidence.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 926–932; Dec. Dig. ⬳352.]

In Error to the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Action at law by T. R. Shadoan, administrator of McKinley Shadoan, deceased, against the Cincinnati, New Orleans & Texas Pacific Railway Company. Judgment for defendant, and plaintiff brings error. Reversed.

T. L. Edelen, of Frankfort, Ky., and James Denton, of Somerset, Ky. (Robt. Harding, of Danville, Ky., of counsel), for plaintiff in error.

George Hoadly, of Cincinnati, Ohio, for defendant in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. The administrator brought an action in the Pulaski circuit court, charging the railroad company and one of its brakemen, Starling Litton, with negligently and wrongfully causing the death of McKinley Shadoan, a boy 15 years of age. The case was removed to the court below on the ground of diversity of citizenship. In the course of the trial, on motion of plaintiff, Litton was dismissed without prejudice; and at the close of plaintiff's evidence, on motion of the company, a directed verdict was rendered in its favor. The only assignment argued or relied on here charges error in directing the verdict.

The intestate and two other boys boarded a south-bound freight train of the defendant at Burnside, Pulaski county, to ride to and beyond Greenwood, a station about 11 miles south of Burnside, with the intention of returning home on some north-bound train. The boys resided in Burnside, and, having a school holiday, undertook, according to the evidence, "to steal a ride without the knowledge of the train employés." The train in question was the first of two sections, and both entered a side track at Greenwood to permit a north-bound passenger train to pass. There the boys left the train, but after the north-bound train had passed, and the freight train had started to return to the main track, they got on the bumpers of two adjoining box cars forward of the caboose (but how far forward is not shown) and were discovered by the conductor of the freight train. The conductor threw stones at them, and also beneath the cars, to drive them off. They again left the train and started away from the track. The track there runs north and south in a cut, and the railroad right of way is bounded on the east by a county road; the right of way and the road being separated by a wire fence. When the boys started away from the track, the conductor climbed to the top of a box car, and with his right hand made a motion indicating an intent again to throw at the boys, and with his left hand motioned toward the rear end of the train, and the boys took this to be a signal to trainmen riding on the caboose. These

motions were made while the boys were close to the wire fence (but on which side is in doubt), and seem to have frightened them.

Shortly after this, Starling Litton, the brakeman, fired a pistol three times from the east side door of the caboose and mortally wounded the intestate. Just where the boys then were is not definitely shown; estimates as to where they were seen immediately after the shooting occurred range from 50 to 75 yards east of the track. When Starling Litton was a defendant, he was called by the plaintiff to testify by deposition. He did not testify whether he saw the conductor give the signal mentioned or not, but did testify that while on the caboose he saw the boys throwing rocks at the conductor, from a place near the wire fence and some distance south of the caboose, though he could not say on which side of the fence they were, and that while the train was moving slowly on the side track he went below and to a locker of the caboose for his pistol, and in the presence of another brakeman fired from the east door with the result already stated. A rule of the company then in force and applicable to freight brakemen provided:

"They will allow no unauthorized person to enter the cars, ride on the train, or handle freight."

Litton had knowledge of this rule, and was satisfied that the boys had been riding on the train; and, further, his purpose in shooting was to scare them away from the train and prevent them from riding on it. He testified at considerable length. In reference to the rule, for example, this appears:

"Q. Is that the rule you referred to when you say it was your duty to keep an unauthorized person, or persons who didn't have transportation, from riding on the train? A. Yes, sir. Q. And that kind of a rule was in force at the time you did that? A. Yes, sir. Q. Had your train gotten out of the switch when you fired? A. No, sir."

And referring to the shooting:

"Q. Did you believe at that time that would frighten the boys and prevent them from getting on the train? A. I thought it would make a noise and scare them away. Q. And your sole purpose was not to injure them, but to prevent them from coming back on the train? A. Keep them away. Q. And you knew at that time the company required you to keep them from coming back on the train? A. Yes, sir. * * * Q. And you knew they were out there in the direction in which you fired? A. They were south of where I was; the caboose was moving; we were pulling out. Q. And they were still south of you when you fired the shots? A. Yes, sir. * * * Q. From the time you left the top of the caboose and got down and got your pistol, how many feet had it gone? A. Fifty or sixty feet."

Further, on re-examination:

. "Q. You thought you were performing your duty in firing your pistol? A. Yes, sir; to scare them away. Q. You thought your duty required you to scare them away from the train and keep them from getting on the train at the time you fired the shots, didn't you? A. Yes, sir. Q. And it was for that reason alone you fired the shots? A. Just to scare them away. Q. And to prevent them from getting back on the train? A. Yes, sir."

[1] Does such testimony as this, in connection with the recited facts preceding it, present a question of law for the court, or a question of fact for the jury? It is hardly necessary to restate the rule, prevailing

in this court, that upon a motion to direct a verdict it is the duty of the trial judge to take that view of the evidence most favorable to the party against whom the direction is requested. Williams v. Choctaw O. & G. R. Co., 149 Fed. 104, 105, 79 C. C. A. 146; Crucible Steel Forge Co. v. Catharine Moir, Adm'x, 219 Fed. 151, decided January 5, 1915; Worthington v. Elmer, 207 Fed. 306, 308, 125 C. C. A. 50. Stated otherwise, "it must be assumed that plaintiff's testimony is true, and he must have the benefit of every fair inference therefrom." Louisville & N. R. Co. v. Bell, 206 Fed. 395, 398, 124 C. C. A. 277, 280 (C. C. A. 6th Cir). And the rule of fair and reasonable inference deducible from the entire evidence so challenged is not varied, even where there are contradictions in the testimony of one or more of the witnesses, for the credibility of witnesses is purely a question for the jury under proper instructions of the court. Rochford v. Pennsylvania Co., 174 Fed. 81, 83, 98 C. C. A. 105 (C. C. A. 6th Cir.). The issue made in the arguments of counsel presents a striking illustration of the necessity to test the soundness of a directed verdict by such inferences as may be justifiably drawn in accordance with the rules thus pointed out.

[2] Counsel in effect, if not in terms, agree to the proposition that the defendant's liability for the act of Litton is to be determined by the inquiry, whether at the time he fired the shots he was engaged in the course of his employment; the one side contending that he was, and the other that he was not. Many cases are cited and commented upon by counsel, but they are reducible to the issue stated; and owing to their varying facts, peculiar to each, such cases afford but slight assistance in the ultimate solution of a distinct though somewhat similar case, except through the rule they in substance declare that evidence which justifies opposing inferences as to whether the servant was or was not acting within the scope of his employment presents a question of fact for the jury, under appropriate instructions; and some of the cases will presently be cited and considered. It must meanwhile be remembered that Litton believed he was engaged within the scope of his employment and in the performance of a duty to his master at the time he fired the shots; and the evidence tends to justify this belief. He was so situated on the caboose, at the time the conductor gave the signal to train hands riding there, as either to have seen or heard of the signal; and another brakeman stood by his side at the time of the shooting and seemingly acquiesced in it. Further, the slow movement of the train on the side track was calculated to impress Litton with the belief that the boys might board it again; because while on top of the caboose he saw the boys at a place near the wire fence (on which side is not clear) some distance south of him, and in spite of the time he took to go below to the locker, and then to the east door of the caboose to fire the pistol, the boys were still south of him.

It may be true that at the time of the shooting the boys were off the railroad property; still it cannot be safely said that if, after the conductor had motioned to the men on the caboose, nothing further had been done by any of the crew to keep the boys away, they would not have returned to the train while it was on the side track or before

it got under way on the main track. Their purpose was in truth to ride beyond Greenwood. To assume that they would not have reboarded the train would be to treat the evidence as reasonably open to but one inference—that Litton's act was not done in the course of his employment; and upon no other theory could the directed verdict be sustained. Otis Steel Co. v. Wingle, 152 Fed. 914, 917, 82 C. C. A. 62 (C. C. A. 6th Cir.).

Such a theory would not accord to plaintiff the most favorable view of the circumstances disclosed by the record or by Litton's testimony alone.. The rule of the company requiring Litton to prevent unauthorized persons from riding on the train plainly invested him with authority and discretion commensurate with a rightful discharge of the duty. The liability of an employer, however, is not limited simply to the results of acts done by his agent in the proper performance of duty. It is a familiar doctrine that the direct consequences of an agent's acts, done in the wrongful exercise of his authority and in the course of his employment, are chargeable to his master. Hence, under the rule applicable to a motion to direct, we think the evidence gives rise to a substantial inference that Litton's act was done in the course of his employment; it would be sufficient, however, if the evidence should justify opposed inferences in this respect. It is therefore not enough to say that Litton's act was an abuse of his authority; nor that the boys either were in fact or threatening to become trespassers, for that could not rightfully subject any of them to the consequence that happened through the method adopted by Litton to prevent them from riding on the train. Rounds v. Del., Lack. & West. R. R. Co., 64 N. Y. 129, 138, 21 Am. Rep. 597; Nelson Business College Co. v. Lloyd, 60 Ohio St. 448, 459, 54 N. E. 471, 46 L. R. A. 314, 71 Am. St. Rep. 729; Brennan v. Merchant & Co., Inc., 205 Pa. 258, 261, 262, 54 Atl. 891; Ritchie v. Waller, 63 Conn. 155, 161, 28 Atl. 29, 27 L. R. A. 161, 38 Am. St. Rep. 361; St. Louis, I. M. & S. Ry. v. Hendricks, Adm'r, 48 Ark. 177, 181, 2 S. W. 783, 3 Am. St. Rep. 220; Brunner v. Telegraph, etc., Co., 160 Pa. 300, 303, 28 Atl. 690; Schulte v. Holliday, 54 Mich. 74, 76, 19 N. W. 752; Peck v. Mich. Cent. R. R. Co., 57 Mich. 3, 7, 23 N. W. 466; Planz v. Boston & Albany Railroad, 157 Mass. 377, 380, 32 N. E. 356, 17 L. R. A. 835; Pierce v. Railroad Co., 124 N. C. 83, 87, 32 S. E. 399, 44 L. R. A. 316; Pollaty v. Char. & West. Car. Co., 67 S. C. 391, 398, 45 S. E. 932, 100 Am. St. Rep. 750; McKeon v. New York, etc., Railroad, 183 Mass. 271, 274, 67 N. E. 329, 97 Am. St. Rep. 437. And see Sharp v. Erie R. R. Co., 184 N. Y. 100, 104, 105, 76 N. E. 923, 6 Ann. Cas. 250; Conchin v. El Paso, etc., R. R. Co., 13 Ariz. 259, 262, 263, 108 Pac. 260, 28 L. R. A. (N. S.) 88; 2 Cooley on Torts (3d Ed.) p. 1017; 2 Wood on R. R. (2d Ed.) § 316, p. 1404.

[3] The case of C., N. O. & T. P. Ry. Co. v. Rue, 142 Ky. 694, 699, 134 S. W. 1144, 1146 (34 L. R. A. [N. S.] 200), relied on by defendants, was disposed of after recovery below and in full recognition of the settled rule in that court that a master is responsible for the wrongful act of his servant if "done in execution of the authority, express or implied, given by the master"; but the court upon weighing

the evidence found that the servant's act did not fall within the rule (142 Ky. 703, 134 S. W. 1144, 34 L. R. A. [N. S.] 200). In this court, however, the prevailing rule of decision is that in disposing of a motion to direct a verdict the trial judge cannot weigh the evidence. See, in addition to the decisions of this court first above cited, Mt. Adams & E. P. Inclined Ry. Co. v. Lowrey, 74 Fed. 463, 477, 20 C. C. A. 596; Big Brushy Coal & Coke Co. v. Williams, 176 Fed. 529, 532, 99 C. C. A. 102. Cases like Little Miami Railroad Co. v. Wetmore, 19 Ohio St. 110, 2 Am. Rep. 373, have no more relevancy here than that case had in Nelson Business College Co. v. Lloyd, supra, 60 Ohio St. at pages 454, 460, 54 N. E. 471, 46 L. R. A. 314, 71 Am. St. Rep. 729.

The judgment must be reversed, with costs, and a new trial awarded.